IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **VONTESSA ROSS**, *et al.*, | * |
| | * |
|     **Plaintiff,** | * |
| | * |
| v. | *   Civil Case No. SAG-20-0088 |
| | * |
| **TWENTY-FOUR/SEVEN BAIL** | * |
| **BONDS, LLC**, *et al.*, | * |
| | * |
|     **Defendants.** | * |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OPINION

Plaintiffs Vontessa Ross and Kendra Sumpter ("Plaintiffs") filed a class action Complaint, concerning the issuance of bail bonds, against Twenty-Four/Seven Bail Bonds, LLC ("Twenty-Four/Seven"), Randolph Smith, Crum & Forster Indemnity Company ("C&F"), and Herbert A. Thaler, Jr., (collectively, "Defendants") in the Circuit Court of Maryland for Baltimore City on October 15, 2019. ECF 5. Defendant Thaler removed the lawsuit to this Court on January 13, 2020. ECF 1-2. Currently pending is a Motion to Dismiss filed by C&F. ECF 14; ECF 14-1 (collectively, "the Motion"). Plaintiffs filed an opposition, ECF 21, and C&F filed a reply, ECF 23. For the reasons explained below, C&F's Motion will be denied without prejudice, but this lawsuit will be stayed pending anticipated proceedings before the Maryland Insurance Administration ("MIA").

### I.  FACTUAL BACKGROUND

The following facts are alleged in Plaintiffs' Complaint. Defendant Randolph Smith operates Defendant Twenty-Four/Seven, a bail bond company. ECF 5, ¶¶ 29, 30, 32, 36. Defendant C&F is a surety company authorized to do business in Maryland, and has appointed

Twenty-Four/Seven to act as its authorized agent with respect to the issuance of bail bonds.  *Id.* ¶¶ 28-29.

When a judge sets bail for a criminal defendant, the defendant can post the full amount of the bail, remain in jail, or purchase a bail bond.  *Id.* ¶¶ 20-21.  When a bail bond is purchased, the surety agrees to pay the State the full amount of the bond, should the defendant fail to appear.  *Id.* ¶ 21.  Bail bond companies act as the intermediary between the defendant and the surety, and charge a non-refundable premium for their services (typically ten percent of the total money bail).  *Id.* ¶ 22.  Usually, at the conclusion of a criminal case, a trial judge returns in full a bond directly posted by a criminal defendant, as long as the defendant appears for court proceedings.  *Id.*  If the defendant utilizes the services of a bail bond company, however, the premiums collected by the bail bond companies are not returned.  *Id.*  Bail bond companies pay a percentage of those retained premiums to the sureties.  *Id.* ¶ 23.

On or about June 1, 2017, Plaintiffs signed a contract with Twenty-Four/Seven to obtain a $50,000 bail bond to effect the release of Plaintiff Sumpter from custody.  *Id.* ¶¶ 37-38.  The ten percent premium owed to Twenty-Four/Seven was $5,000.  *Id.* ¶ 38.  Plaintiffs paid $900 at the time of signing.  *Id.* ¶ 39.  The bail bond contract did not indicate the amount and due date for the installment payments, or the number of installment payments to be made.  *Id.* ¶ 40.  Plaintiffs made two additional installment payments in 2017, totaling $250.  *Id.* ¶¶ 42-43.

On June 2, 2019, two years after the bond issued, Twenty-Four/Seven, through its attorney, Defendant Thaler, filed a consumer debt action in the District Court of Maryland for Baltimore City against Plaintiff Ross, to collect the remainder of the $5,000 premium.  *Id.* ¶ 44.  Plaintiffs allege that Defendants were not allowed to enter into or collect payments on bail contracts, including Plaintiffs', because Twenty-Four/Seven was "an unlicensed bail bond

company." *Id.*; *see also id.* ¶¶ 33-35 (alleging that Twenty-Four/Seven's license with the MIA expired on August 21, 2016, but that Twenty-Four/Seven continued to do business without renewing it). Based on the fact that Twenty-Four/Seven was "unlicensed," and because their bail bond contract did not properly explain the required installment payments, Plaintiffs, and the proposed class, assert claims under the Maryland Consumer Debt Collection Act, the Maryland Consumer Protection Act, the Federal Fair Debt Collection Practices Act, and the Maryland common law for unjust enrichment. *Id.* ¶¶ 74-110. Plaintiffs and the class also seek various forms of declaratory and injunctive relief. *Id.* ¶¶ 111-16.

## II. LEGAL STANDARD

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see*

*Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). However, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Further, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). However, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating

the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

### III. ANALYSIS

Each of Plaintiffs' claims hinges on whether Twenty-Four/Seven violated the Maryland Insurance Code by (1) issuing bail bonds while not properly licensed or registered as a trade name of a valid license holder, as required by Md. Code Ann., Ins. §§ 10-103, -113 (West 2020); or (2) failing to provide Plaintiffs with the schedule for the installment payments, as required by Md. Code Ann., Ins. § 10-309(c).  If neither statutory violation occurred, then each of Plaintiffs' claims fails, because Plaintiffs would have no basis to contend that the bail bond contracts were unenforceable, or that Twenty-Four/Seven had somehow misrepresented its licensing status. Further, unless Twenty-Four/Seven acted in violation of the Maryland Insurance Code, its operator, Smith, its alleged agent, C&F, and its attorney, Thaler, could not be liable for any contributions to any such violation or for trying to collect on an "unenforceable" contract.

In addition to enumerating the various requirements for sureties, bail bondsmen, and other insurers to comply with state law, the Maryland Insurance Code contains an extensive remedial scheme, permitting the Commissioner to take a wide range of actions against any entity who violates of the Code's provisions.  Specifically, with respect to § 10-309, the section provides, "If a bail bondsman violates any provision of this section, the Commissioner may take any actions authorized under 10-126 of this title." *Id.* § 10-309(f).

It is fair to say, however, that with respect to the two statutory violations at issue in this case, the Maryland Legislature has not specified whether the administrative remedies set forth in

the Insurance Code were intended to be exclusive, primary, or concurrent with court jurisdiction. *See Zappone v. Liberty Life Ins. Co.,* 349 Md. 45, 62 (1998) ("While sometimes the Legislature will set forth its intent as to whether an administrative remedy is to be exclusive, or primary, or simply a fully concurrent option, most often statutes fail to specify the category in which an administrative remedy falls."). In such circumstances, there is "a presumption that the administrative remedy is intended to be primary, and that a claimant cannot maintain the alternative judicial action without first invoking and exhausting the administrative remedy." *Id.* at 63 (citing, *inter alia*, *Md. Reclamation Assocs., Inc. v. Harford County,* 342 Md. 476, 493 (1996); *Luskin's v. Consumer Prot.*, 288 Md. 188, 194-99 (1995)). That presumption is rebuttable, however, and *Zappone* set out four factors that courts should consider, in cases like this one, to evaluate whether the legislature intended for an administrative remedy to be primary. *Id.* at 64-65. As explained below, each of those four factors counsels in favor of the MIA having primary jurisdiction over the underpinning claims at issue here.

    A.   **The Comprehensiveness of the Administrative Remedy**

First, a court must consider "the comprehensiveness of the administrative remedy." *Id.* at 64. In a later case, *Carter v. Huntington Title & Escrow, LLC,* 420 Md. 605, 627 (2011), the Court of Appeals explained:

> The Insurance article is composed of nearly thirty diverse titles, ranging from "Health Insurance" to the "Slavery Era Insurance Policy Reporting." There are a vast amount of provisions, spread over multiple titles, that apply just to title insurers, like Huntington. No doubt the General Assembly created a comprehensive, if not complex, regulatory and remedial scheme (though, some may find the word "labyrinthine" a fairer description)."

The *Carter* court further found "indicia suggesting that the Legislature evinced a preference for primary jurisdiction" for claims implicating violations of the Insurance Code, including the

language in the penalty provisions of the Insurance Code referring to the findings or beliefs of "the Commissioner," which imply "that the MIA, not the courts, should take the first cut at such claims." *Id.* at 626.

While *Carter* concerned Title 27 of the Insurance Article, that same analysis is apt when describing the Code's provisions applicable to bail bond insurers under Title 10. Like the Court in *Carter*, this Court finds the Insurance Code's scheme sufficiently comprehensive to indicate that the Legislature displayed an intent for claims to proceed first through the MIA. In fact, there is no evidence that the Legislature intended for civil litigants to enforce the licensing or installment payment plan provisions through a private action. First, as to the notion that Twenty-Four/Seven was not properly licensed, there does not appear to be any private remedy in Subtitle 1 of Title 10 of the Insurance Article. *See* Md. Code Ann., Ins. §§ 10-101 to -133. Only § 10-131 discusses the consequences of violating the insurance requirement of § 10-103(c), but those consequences are *penal* in nature: "A person that violates § 10-103(b) or (c) . . . is *guilty of a misdemeanor* and on conviction is subject to a fine not exceeding $500 or imprisonment not exceeding 5 months or both for each violation. *Id.* § 10-131 (emphasis added). Second, there is similarly lacking any private remedy for a violation of the installment payment plan provision set forth in § 10-309(c). In fact, the installment agreement provision requires said agreement to be "in a form adopted by the Commissioner." *Id.* § 10-309(c)(1). Section 10-309(f), as noted above, cross-references the robust remedial scheme in § 10-126. That remedial scheme provides *the Commissioner* the authority to (1) suspend or revoke the licensee's license; (2) impose a monetary penalty on the license holder; and/or (3) "require that restitution be made to any citizen who has suffered financial injury because of the violation of this article." *Id.* § 10-126(c)–(d).

Thus, the relevant statutory scheme here appears to provide the Commissioner, and the State, the ability to vindicate the interests of individuals like Plaintiffs, who are harmed as a result of conduct like Defendants are alleged to have engaged in. Title 10 of the Insurance Article is noticeably lacking any express language providing Plaintiffs the ability to vindicate their interests themselves. Accordingly, it is apparent from the statutory scheme that the Legislature intended the Insurance Commissioner to have primary jurisdiction when alleged violations arise. *See Carter*, 420 Md. at 628 ("[W]e find that the Legislature evinced an intent – in the sophistication of the framework of prohibited acts that is the Insurance Article (and in the other *Zappone* factors)—that claims dependent on the Article, in that they allege and depend on a statutory benchmark violation, should be considered first by the administering agency."). Like *Carter*, Plaintiffs here improperly attempt to "pursue directly a judicial remedy in a court of law merely by characterizing or recasting the regulatory violation as" a Debt Collection, Consumer Protection, and common law claim. *Id.* at 627-28.

### B. The MIA's View of its Own Jurisdiction

The second *Zappone* factor is the "agency's view of its own jurisdiction." *Zappone*, 349 Md. at 65. Although the MIA has not weighed in on this particular case, in other cases, it has taken the position that, "When an administrative process is available to a litigant for the violation of a statutory obligation, that process must be pursued and exhausted before judicial relief may be sought." *Carter*, 420 Md. at 629 (citing Brief for the Md. Ins. Admin. as Amicus Curiae Supporting Appellee, *Med. Protective Co. v. Bottiglieri,* No. 1826 (Md. App. Jan 14, 2008), at 1). That quote suggests that MIA would favor enforcement of its primary jurisdiction over the Insurance Code violation issues in this case.

C.     The Dependence of Plaintiffs' Claims on the Statutory Scheme

The third *Zappone* factor is the claim's dependence on the statutory scheme. 349 Md. at 65. As discussed above, Plaintiffs' Debt Collection, Consumer Protection, and common law claims rely completely on their ability to establish one of two violations of Title 10 of the Insurance Article: a violation of § 10-103(c)'s licensing/registration requirement, or a violation of § 10-309(c)'s requirement with respect to disclosure of terms of an installment plan. Plaintiffs identify no other "misrepresentations" by Twenty-Four/Seven, or any other defendant, that would exist if Twenty-Four/Seven is determined to have fulfilled both of those statutory requirements.

That conclusion is in accord with the Fourth Circuit's opinion in *Arthur v. Ticor Title Ins. Co. of Florida,* 569 F.3d 154 (2009). The *Arthur* Plaintiffs had alleged that an insurance company charged double its approved rates for title insurance policies in connection with a mortgage refinance. *Id.* at 156-57. In relevant part, the Plaintiffs stated a claim for "money had and received under Maryland common law." *Id.* at 157. United States District Judge Andre M. Davis dismissed that claim "because plaintiffs had failed to exhaust the administrative remedies that were available to them under the Maryland Insurance Code – which authorized the Insurance Commissioner to order, among other things, restitution for a violation of the Insurance Code." *Id.* at 157 (citing Md. Code Ann., Inc. § 4-113(d)(2)). The Fourth Circuit reasoned:

> We agree with the district court that exhaustion was required. Under Maryland law, when the statutory text creating an administrative remedy is not dispositive, there is "a presumption that the administrative remedy is intended to be primary, and that a claimant cannot maintain the alternative judicial action without first invoking and exhausting the administrative remedy." *Zappone v. Liberty Life Ins. Co.,* 349 Md. 45, 706 A.2d 1060, 1069 (1998) (citing additional cases). Moreover, where a judicial remedy is "wholly or partially dependent upon the statutory scheme which also contains the administrative remedy, or upon the expertise of the administrative agency," Maryland courts have "usually held" that exhaustion

9

> is required. *Zappone,* 706 A.2d at 1070 (citing cases); *see Muhl v. Magan*, 313 Md. 462, 545 A.2d 1321, 1322, 1330-31 (1988); *see also Fosler v. Panoramic Design, Ltd.*, 376 Md. 118, 829 A.2d 271, 280-82 (2003); *Bell Atl. of Md., Inc. v. Intercom Sys. Corp.,* 366 Md. 1, 782 A.2d 791, 806-07 (2001).
>
> Plaintiffs' claim in this case is dependent on the Insurance Code because that claim will succeed only if plaintiffs show that Ticor violated the Code. If the Insurance Code did not require Ticor to adhere to its filed rates, plaintiffs would have no right to recover from Ticor for charging an excessive fee. Indeed, plaintiffs have suggested no reason other than a violation of the Insurance Code that Ticor would be liable to them under a claim for money had and received. *Zappone,* on which plaintiffs rely to argue that exhaustion was not required, did not address a claim for exceeding filed insurance rates, but instead claims for fraud and negligence that were "wholly independent" of the Insurance Code. 706 A.2d at 1071. Plaintiffs' claim, by contrast, explicitly depends on the statute that also makes administrative remedies available to plaintiffs.

*Arthur,* 569 F.3d at 161. Like the claim in *Arthur,* all of Plaintiffs' claims in the instant case are wholly dependent on Twenty-Four/Seven's alleged violations of the Insurance Code. If Twenty-Four/Seven complied with the Insurance Code by being properly registered and by appropriately disclosing the installment payment plan, Plaintiffs have no independent basis for any of their claims. In other words, Plaintiffs' alleged actions are only potentially unlawful because of the requirements of the Insurance Code, not for any other reason.

Plaintiffs' attempt to invoke *Zappone* and *Mardirossian v. Paul Revere Life Ins. Co.,* 376 Md. 640, 649 (2003), to defeat primary jurisdiction is unavailing, because both cases are factually distinguishable. In *Zappone*, the defendant was alleged to have made patently false statements to the plaintiff about the benefits of a life insurance policy. 349 Md. at 52-56. Although those statements constituted plausible violations of the Unfair Trade Practices provisions of the Maryland Insurance Code, they also independently provided a basis for fraud and misrepresentation claims under common law, without any reference to the Insurance Code. Similarly, in *Mardirossian,* the plaintiff sought to compel specific performance of an oral

10

contract, which happened to concern the purchase of disability insurance. 376 Md. at 642-45. The consumers had a common law contract remedy outside of the remedies available to them under the Insurance Code, constituting a wholly independent cause of action. *See also Carter*, 420 Md. at 630 ("The causes of action in *Zappone* and *Mardirossian* were treated as common law in nature because they existed without an essential underpinning found in the Insurance Article."). In contrast to *Zappone* and *Mardirossian*, Plaintiffs' claims for relief are entirely dependent on whether Twenty-Four's conduct constituted violations of the Insurance Code. *See id.* at 626 (distinguishing *Zappone, Mardirossian,* and other cases presenting independent common law remedies from those alleging "purely statutory violations."). If Twenty-Four/Seven acted in full compliance with the Insurance Code, none of Plaintiffs' claims can stand, and thus the question of the bail bond company's compliance should be adjudicated before the MIA.

Finally, Plaintiffs' reliance on *Vicente v. Prudential Ins. Co. of America*, 105 Md. App. 13 (1995) is similarly unpersuasive. *Vicente* concerned a customer who sued a health insurance agent for fraud and negligent misrepresentation, after the agent falsely told the customer that the health-insurer principal "was licensed to sell insurance in Maryland," and that he met certain statutory capitalization requirements. *Id.* at 15. The Court of Special Appeals held that the customer had to exhaust these claims with the MIA, *id.* at 23-25, but the *Zappone* court summarily overruled *Vicente*, *Zappone*, 349 Md. at 66. In *Carter*, the Court of Appeals explained the propriety behind this, noting that in *Vicente*, "the customer was concerned not that the Insurance Article required the health insurer to be licensed and capitalized, but that the agent lied to the customer about these details. The Insurance Article, in other words, was not the grounding of the customer's grievances." *Carter*, 420 Md. at 633. Here, however, the Insurance Article *is* the grounding of Plaintiffs' Complaint – whether Defendants "lied" to Plaintiffs about

11

Twenty-Four/Seven being insured can only be resolved through determining whether their filings satisfied the MIA's filing requirements. Similarly, whether Twenty-Four/Seven engaged in deceptive practices through their installment plan disclosures hinges directly on whether their disclosures met the requirements of § 10-309(c). Accordingly, this Court concludes that Plaintiffs' claims wholly depend on the Insurance Article's statutory scheme.

### D. The Dependence of Plaintiffs' Claims on the MIA's Expertise

The fourth and final *Zappone* factor is the claim's dependence upon the expertise of the agency. 349 Md. at 65. Although the factual issues presented might seem like ones that can be easily resolved, the exhibits submitted by the parties suggest that this case could require a nuanced assessment of the filings before the MIA. The parties do not dispute that Twenty-Four/Seven's independent license expired in 2016. However, the paperwork reflects that Defendant Smith maintains a valid license, registered to "Randolph Smith, Twenty Four Seven Bail Bond," ECF 14-2 at 11, and has a valid trade name registration for Twenty-Four/Seven Bail Bonds that had been renewed through the time of Plaintiffs' bond, ECF 23-6. While Plaintiffs contend that "[t]here is no public designation that 'Twenty-Four Seven Bail Bond' was being used as a properly filed trade name," and "[u]sing a name in an address line is not the same as properly registering a trade name with the Insurance Commissioner," ECF 21 at 7, the MIA is the appropriate entity to assess whether the various licenses and registrations in this case fulfill the statutory requirements. Although the question about whether Twenty-Four/Seven provided sufficient information about the installment payments to Plaintiffs might be less dependent upon the MIA's expertise, in light of the more complex licensing question above, Plaintiffs' claims generally are best presented to the MIA for resolution. Thus, all four *Zappone* factors weigh in

favor of the MIA's exercise of its primary jurisdiction to determine whether Twenty-Four/Seven's actions violated the Insurance Code.

### E. The Proper Procedural Remedy is to Stay the Case, Not to Dismiss It

Finally, in *Carter,* the Maryland Court of Appeals considered the appropriate disposition for a case involving the primary jurisdiction of an administrative agency. 420 Md. at 637-38. Because primary jurisdiction only prohibits the adjudication of a claim in court *prior to* the exhaustion of the administrative remedy, the Court instructed the circuit court to "stay further proceedings regarding the judicial complaint until the outcome of the administrative adjudication," leaving open the possibility of dismissal if the plaintiff does not timely pursue administrative relief. *Id.* This Court will adhere to that procedure in the instant case, rather than granting the dismissal C&F seeks.

### IV. CONCLUSION

For the reasons set forth above, C&F's Motion to Dismiss, ECF 14, will be denied without prejudice. This case will be stayed, and administratively closed, until the outcome of the anticipated administrative adjudication of Plaintiffs' claims. If Plaintiffs neglect to pursue administrative relief within ninety days, C&F is directed to notify this Court, and Plaintiffs' claims may be dismissed. If the stay of this case is lifted following the administrative adjudication, C&F will be permitted to refile its motion to dismiss, to allow this Court to consider its other contentions, including whether Twenty-Four/Seven acted as C&F's agent in entering the installment arrangement with Plaintiffs and in filing a collection action. A separate Order follows.

Dated: July 8, 2020                              /s/
                                                 Stephanie A. Gallagher
                                                 United States District Judge